1

2

3

4

5

6

7

8 **UNITED STATES DISTRICT COURT**

9 **EASTERN DISTRICT OF CALIFORNIA**

10

| | | |
|---|---|---|
| 11 JONATHAN KIRKELIE, | ) | Case No.: 1:15-cv-00735-DAD-SAB (PC) |
| 12      Plaintiff, | ) ) ) | **FINDINGS AND RECOMMENDATIONS** |
| 13      v. | ) ) ) | **REGARDING DEFENDANTS' MOTION TO DISMISS AND MOTION FOR SUMMARY** |
| 14 C.O. THISSELL, et al., | ) ) | **JUDGMENT** |
| 15      Defendants. | ) ) | [ECF No. 29] |
| 16 _____ | ) | |

17      Plaintiff Jonathan Kirkelie is a prisoner in the custody of the Federal Bureau of Prisons

18 ("BOP").  Plaintiff is proceeding pro se and in forma pauperis in this civil rights action pursuant to

19 <u>Bivens v. Six Unknown Federal Narcotics Agents</u>, 403 U.S. 388 (1971).  Plaintiff consented to the

20 United States Magistrate Judge jurisdiction.[1]  However, Defendants have not consented or declined

21 United States Magistrate Judge jurisdiction; therefore, this action was referred to the undersigned

22 pursuant to 28 U.S.C. § 636(c).

23      Currently before the Court is Defendants' motion to dismiss or, in the alternative, motion for

24 summary judgment, filed August 5, 2016.

25 ///

26 ///

27

28 _____

[1] Plaintiff consented to United States Magistrate Judge jurisdiction on May 28, 2015.  (ECF No. 6.)

1

# I.

## PROCEDURAL BACKGROUND

This action is proceeding on Plaintiff's Fourth and Eighth Amendment claims against Defendant Thissell and Eighth Amendment claim for failure to protect against Defendants Smith, Mahdavi, Masterson, Knoll, and Does 1 and 2.

As previously stated, on August 5, 2016, Defendants Knoll, Mahdavi, Masterson, Smith and Thissell filed a motion to dismiss or, in the alternative, motion for summary judgment.[2]

After receiving two extensions of time, Plaintiff filed an opposition on November 17, 2016, and Defendants filed a timely reply on November 29, 2016.

# II.

## LEGAL STANDARDS

### A.     Motion to Dismiss

A motion to dismiss brought pursuant to Rule 12(b)(6) tests the legal sufficiency of a claim, and dismissal is proper if there is a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. Conservation Force v. Salazar, 646 F.3d 1240, 1241-42 (9th Cir. 2011) (quotation marks and citations omitted). In resolving a 12(b)(6) motion, a court's review is generally limited to the operative pleading. Daniels-Hall v. National Educ. Ass'n, 629 F.3d 992, 998 (9th Cir. 2010); Sanders v. Brown, 504 F.3d 903, 910 (9th Cir. 2007); Schneider v. California Dept. of Corr., 151 F.3d 1194, 1197 n.1 (9th Cir. 1998).

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim that is plausible on its face. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)) (quotation marks omitted); Conservation Force, 646 F.3d at 1242; Moss v. U.S. Secret Service, 572 F.3d 962, 969 (9th Cir. 2009). The Court must accept the factual allegations as true and draw all reasonable inferences in favor of the non-moving party, Daniels-Hall, 629 F.3d at 998; Sanders, 504 F.3d at 910; Morales v. City of Los

---

[2] Concurrently with their motion, Defendants served Plaintiff with the requisite notice of the requirements for opposing the motion. Woods v. Carey, 684 F.3d 934, 939-41 (9th Cir. 2012); Rand v. Rowland, 154 F.3d 952, 960-61 (9th Cir. 1998).

Angeles, 214 F.3d 1151, 1153 (9th Cir. 2000), and in this Circuit, pro se litigants are entitled to have their pleadings liberally construed and to have any doubt resolved in their favor, Wilhelm v. Rotman, 680 F.3d 1113, 1121 (9th Cir. 2012); Watison v. Carter, 668 F.3d 1108, 1112 (9th Cir. 2012); Silva v. Di Vittorio, 658 F.3d 1090, 1101 (9th Cir. 2011); Hebbe v. Pliler, 627 F.3d 338, 342 (9th Cir. 2010).

>   **B.     Motion for Summary Judgment**

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mutual Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011). Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1) (quotation marks omitted). The Court may consider other materials in the record not cited to by the parties, but it is not required to do so. Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified School Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo County, Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

Plaintiff bears the burden of proof at trial, and to prevail on summary judgment, he must affirmatively demonstrate that no reasonable trier of fact could find other than for him. Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). Defendants do not bear the burden of proof at trial and in moving for summary judgment, they need only prove an absence of evidence to support Plaintiff's case. In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010). If Defendants meet their initial burden, the burden then shifts to Plaintiff "to designate specific facts demonstrating the existence of genuine issues for trial." In re Oracle Corp., 627 F.3d at 387 (citing Celotex Corp., 477 U.S. at 323). This requires Plaintiff to "show more than the mere existence of a scintilla of evidence." Id. (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

However, in judging the evidence at the summary judgment stage, the Court may not make credibility determinations or weigh conflicting evidence, Soremekun v. Thrifty Payless, Inc., 509 F.3d

978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, <u>Comite de Jornaleros de Redondo Beach v. City of Redondo Beach</u>, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted). The Court determines *only* whether there is a genuine issue for trial and in doing so, it must liberally construe Plaintiff's filings because he is a pro se prisoner. <u>Thomas v. Ponder</u>, 611 F.3d 1144, 1150 (9th Cir. 2010) (quotation marks and citations omitted).

In arriving at this recommendation, the Court has carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties. Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this Court did not consider the argument, document, paper, or objection. This Court thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate.

### III.

### DISCUSSION

**A.    Complaint Allegations**

On September 14, 2014, during dinner at the Federal Correctional Institution of Mendota, California, Plaintiff was exiting his assigned job in the chow hall on the "A" side at sometime between 5:00 and 6:00 p.m. Correctional officer Thissell pulled Plaintiff to the side to conduct a pat-down search of Plaintiff's person.

Thissell's pat-down began from the back, roaming his hands all over Plaintiff's upper body. Thissell then grabbed and cupped Plaintiff's genitals in an aggressive manner. Thissell then whispered in Plaintiff's ear, "You don't feel like a Mexican." Thissell then searched up and down each leg of Plaintiff and then stepped back. Plaintiff took a step forward, believing the search was concluded, at which time and without warning Thissell from behind aggressively grabbed Plaintiff's genitals again causing another surge of excruciating pain to Plaintiff.

4

The sexual assault was witnessed by several inmates and officer Alvarez.  Alvarez was standing directly to Thissell's right and witnessed the sexual assault.  Thissell's conduct was so outrageous that the Plaintiff and others watching saw Alvarez's jaw fall open.

After the assault, Plaintiff was in excruciating pain, embarrassed and in shock and walked back to his housing unit with inmate Owens, who also witnessed the sexual assault by Thissell.  Upon arrival at his housing unit and with word of the assault by Thissell being spread by other inmates and staff who were witnesses, Plaintiff was informed of his right to file a complaint under the Prison Rape Elimination Act ("PREA").  Plaintiff filed the complaint and waited to be contacted by prison officials.

On or about September 16, 2014, Plaintiff sought help from the prison's psychological services department.  Unfortunately, Plaintiff was turned away unseen because no one was available.  Approximately one week later, and with no response from Plaintiff's PREA complaint and no action by prison officials, Plaintiff used the prison's e-mail system to report the Thissell sexual assault to Defendant Warden Gill.

On or about September 25, 2014, Plaintiff was called to the Lieutenant's office and was interviewed by Lieutenant Smith and another unknown Lieutenant regarding the sexual assault by Thissell.  During the interview, Plaintiff was asked to give an account of the sexual assault.  Plaintiff explained in detail what occurred and that officer Alvarez witnessed the entire incident, along with several inmates.  Smith concluded the interview by stating that Thissell was new and improperly trained and that the incident was "no big deal."

Smith then sent Plaintiff to the prison's medical facility to be examined.  Upon arrival, Plaintiff was met by two nurse staff members (a female and a male).  Plaintiff, while in the exam room, was asked to pull down his pants for his genitals to be examined.  Plaintiff requested twice for the female to leave the room.  Each time, the female nurse refused.  After the third request, the female nurse refused to leave but turned her back while the examination was conducted.

From approximately September 26, 2014 to October 6, 2014, Plaintiff met with Defendant Psychologist Mahdavi[3] on four separate visits.

During the first session, Plaintiff was asked by Mahdavi after explaining the sexual assault by Thissell to write down the "pros" and "cons" of reporting the sexual assault within five minutes. Plaintiff complied with the request by Mahdavi who read the list and threw it in the trash in front of Plaintiff.

During the second session, Plaintiff explained he was having trouble sleeping and was anxious, among other things, which was interfering with his relationship with his girlfriend.  Plaintiff discussed his feelings toward Thissell and the sexual assault.  Mahdavi concluded the session and gave Plaintiff a pamphlet entitled "Steps to Progressive Muscle Relaxation," and Mahdavi told Plaintiff that his feelings were normal and to read the pamphlet.

During the third session, Plaintiff discussed his relationship with his girlfriend and family. There was no discussion regarding the sexual assault by Thissell.

During the fourth session, Plaintiff inquired about any action taken by the prison regarding the sexual assault by Thissell.  Plaintiff expressed more concern as to Thissell working in the Plaintiff's housing unit.  Plaintiff further explained how the verbal sexual harassment and pat-down searches were becoming everyday events by Thissell.  Plaintiff explained that he felt Thissell was retaliating against him and felt uncomfortable with Thissella assigned to his housing unit.  Mahdavi concluded the session by telling Plaintiff there was nothing he could do to help him, and Plaintiff's only option was to proceed through the administrative remedy process.

On or about October 12, 2014, Plaintiff returned to the housing unit, at which time he was shocked to see Thissell working in the unit.  Upon entering the unit, Plaintiff was singled out of several other inmates for a pat-down search of Plaintiff's person by Thissell.  While Thissell conducted the pat-down of Plaintiff, Thissell was laughing at Plaintiff after noticing that Plaintiff was trembling and obviously afraid of Thissell.

---

[3] Plaintiff incorrectly identified Defendant Mahdavi as "Mahdavi."

6

Thissell's hand movements were odd, as the pat-down was more along the lines of being rubbed down than a search.  Thissell made several sexual comments to the Plaintiff that he had a nice body and that his skin was soft.  Throughout Thissell's shift, he stared at Plaintiff and made inappropriate comments.

On October 15, 2014, Plaintiff while working his assigned prison job spoke to Defendant Captain (last name unknown) and the same unknown Lieutenant who was in the September 25, 2014, interview.  Plaintiff explained the sexual assault to the Captain and also stated that Thissell was continuing to make sexual remarks and single him out for pat-down searches in retaliation.  The unknown Lieutenant, in front of the Captain, told Plaintiff that he would make sure that Thissell was put in a different housing unit.

On October 16, 2014, Plaintiff went to see Mahdavi about Thissell working the housing unit.  Plaintiff explained that he was intimidated by Thissell and he was uncomfortable by the sexual remarks being made to him by Thissell.  Plaintiff pleaded that Mahdavi do something to help.  Mahdavi told Plaintiff that he could not help him and he had to go through the administrative remedy process.

On or about October 19 through 25, 2014, Thissell was assigned to work the Plaintiff's housing unit.  Every day that Thissell worked the Plaintiff's housing unit, he was singled out for a pat-down search and Thissell told Plaintiff "You're looking good!"  During the pat-down searches, Thissell ran his hands in a creepy masochistic manner while making sexual comments to Plaintiff.

On one occasion, Thissell whispered in Plaintiff's ear while rubbing Plaintiff's shoulders "You're losing weight and you look good, Mr. Kirkelie!"  While performing a pat-down search of Plaintiff, Thissell would often move both hands up and down each leg pushing to the Plaintiff's genitals and commented "You're not happy to see me, Mr. Kirkelie?"

On October 25, 2014, Thissell, while working in Plaintiff's housing unit, singled out Plaintiff for a pat-down search.  Thissell made sexual comments to Plaintiff while he roamed his hands over his chest, cupping and kneading Plaintiff's body.  Thissell noticed that Plaintiff was extremely upset and proceeded to search Plaintiff's locker tossing things around while laughing at Plaintiff.

Plaintiff called his father, Jeff Kirkelie and explained the situation.  Plaintiff's father informed Plaintiff he would call the prison to address the sexual assaults by Thissell.  Plaintiff's father called Lieutenant Masterson.

On November 10 and 14, 2014, Thissell, while assigned to Plaintiff's housing unit, singled out Plaintiff for a pat-down search.  During the pat-down, Thissell's hands roamed Plaintiff's body in an inappropriate manner, and Thissell made more sexual comments about Plaintiff's body and asked why he was so tense.  Thissell's hands went up and down each leg, pausing while pressing the Plaintiff's genitals.

On November 16, 2014, Plaintiff was notified by his counselor that the initial request for an administrative remedy against Thissell was "lost."  Plaintiff then began the process all over again by submitting a new administrative remedy.

In early to mid-January 2015, Plaintiff through the prison e-mail system, contacted the Associate Warden of Operations and inquired about the status of his complaint against Thissell.  The Associate Warden informed Plaintiff that there was no record of Plaintiff's complaint. On January 23, 2015, Plaintiff met with a prison staff member who presented him with his BP-9 (administrative remedy request) one month late.  The unknown prison official requested that Plaintiff back-date the log book in order to make the late BP-9 look as if it were in compliance and timely. Plaintiff refused and demanded the prison official put the correct date in the log book reflecting the actual date the Plaintiff received the untimely BP-9 response from the Warden.

On March 5, 2015, Plaintiff met with A. Riofrio, who presented Plaintiff with a late BP-10 response.  A. Riofrio told Plaintiff, "it was not her fault that the BP-10 was late.  It must have been misplaced in another unit."

Sometime in late March or early April 2015, Thissell was back working in Plaintiff's housing unit.  During all of the times that Thissell worked in Plaintiff's housing unit, he singled out Plaintiff for a pat-down search and then shook down his locker.  During the pat-downs, Thissell moved his hands in an unprofessional manner and made sexual comments about Plaintiff's body.

On or about April 4, 2015, Plaintiff sent through the prison e-mail system to the new Warden, Zuniga, and asked why Thissell is constantly put back in the Plaintiff's housing unit with knowledge that Plaintiff had filed a sexual assault claim against him.

On or about April 7, 2015, Plaintiff was summoned to see Lieutenant Knoll.  Knoll told Plaintiff that their investigation was over and "Knoll will put Thissell anywhere on this compound he wants."

On May 15, 2015, Plaintiff filed a civil rights complaint with this Court.

Sometime thereafter, Plaintiff's locker was shaken down by an unknown correctional officer or officers.  The only items missing from Plaintiff's locker were Plaintiff's note and a calendar which documented everything that took place involving the sexual assault by Thissell, including the BP-9, Bp-10 and BP-11 inmate appeals.

On or about May 28, 2015, Plaintiff received a 300-series write up for having a clothesline in his living area.  The write up was made by A. Riofrio, a prison secretary who the Plaintiff named in his various requests for administrative remedy and the same individual who requested that Plaintiff falsify the incorrected dated document.

On or about July 28, 2015, Plaintiff was transferred to the Federal Correctional Institution at Terminal Island, California, where he is currently incarcerated.

Sometime between April and June 2015, Plaintiff spoke to inmate Jamie Hernandez-Samudio (Fed. Reg. No. 11629-010), who told Plaintiff that he was also sexually assaulted by Thissell and when he informed Lieutenants Smith and Knoll, he was locked in the staff bathroom for over one hour.  Smith and Knoll later threatened inmate Hernandez-Samudio with placement in the Special Housing Unit to be "buried there."

**B.     Motion to Dismiss**

Defendants argue that Plaintiff has failed to state a cognizable claim under the Fourth and Eighth Amendments.

Plaintiff's complaint was screened and the Court determined it stated a claim upon which relief may be granted.  28 U.S.C. § 1915A; Nordstrom, 762 F.3d at 908 ("Dismissal for failure to state a claim under § 1915A 'incorporates the familiar standard applied in the context of failure to state a

claim under Federal Rule of Civil Procedure 12(b)(6).'") (quoting <u>Wilhelm</u>, 680 F.3d at 1121); <u>Watison v. Carter</u>, 668 F.3d 1108, 1112 (9th Cir. 2012) (section 1915(e)(2)(B)(ii) screening standard is the same as Rule 12(b)(6) standard). Defendants acknowledgement that the complaint was screened is noted; however, Defendants present no arguments which persuade the Court it erred in determining that Plaintiff's Fourth and Eighth Amendment claims were cognizable or that any other grounds justifying relief from the screening order exist. <u>See</u> <u>Ingle v. Circuit City</u>, 408 F.3d 592, 594 (9th Cir. 2005) ("A district court abuses its discretion in applying the law of the case doctrine only if (1) the first decision was clearly erroneous; (2) an intervening change in the law occurred; (3) the evidence on remand was substantially different; (4) other changed circumstances exist; or (5) a manifest injustice would otherwise result."). Therefore, the Court will proceed to issue a ruling on Defendants' alternative motion for summary judgment.

### C.   Motion for Summary Judgment

Defendants move for summary judgment or, in the alternative, qualified immunity.

   1.   <u>Undisputed Facts</u>[4]

   a.   Plaintiff Jonathan Kirkelie, a federal prisoner at Federal Correctional Institution (FCI) Mendota, was assigned to a work detail as a PM Food Service worker to help prepare the evening meal for the inmate population. (Compl., ECF No. 17, p. 1; Knoll Decl., ¶ 2.)

   b.   After each meal served at FCI Mendota, correctional officers stand post outside the dining hall to pat search inmates for any contraband items. (Compl. at p. 1; Knoll Decl. ¶ 5.)

   c.   Jeremy Thissell joined the BOP on April 20, 2014, and he did not have a permanent work assignment at the FCI for the first year of his employment; instead was rotated throughout the prison. (Knoll Decl. ¶¶ 6, 17; Ex. 11, Thissell Housing Unit Assignment 9.1.14-12.31.14.)

   d.   Thissell was never permanently assigned to Plaintiff's unit (unit A2). Id.

   e.   On September 14, 2014, at approximately 5:50 p.m., after completing his shift as a PM

---

[4] Plaintiff neither filed his own separate statement of disputed facts nor admitted or denied the facts set forth by defendant as undisputed. Local Rule 56-260(b). Therefore, Defendants' statement of undisputed facts is accepted except where brought into dispute by Plaintiff's verified complaint. <u>Jones v. Blanas</u>, 393 F.3d 918, 923 (9th Cir. 2004) (verified complaint may be used as an opposing affidavit if it is based on pleader's personal knowledge of specific facts which are admissible in evidence).

Food Service worker, Plaintiff was subject to a pat down search outside the dining hall.  (Compl., p. 1; Knoll Decl., ¶ 8; Ex. 2, Plaintiff 9/14/14 Email to OIG.)

f.      On September 14, 2014, Thissell was assigned to conduct pat searches outside the dining hall at the usual time and place in plain view of other inmates and staff.  (Compl., at p. 7-8; Knoll Decl., ¶ 17; Ex. 11, Thissell Housing Unit Assignment 9/1/14-12.31.14; Ex. 17, Plaintiff Decl., ¶ 6.)

g.      On September 14, 2014, Plaintiff sent an Email to OIG.  Whether Plaintiff knew it or not, he did not send the e-mail to any staff member at FCI Mendota.  (Knoll Dec., ¶ 9, Ex. 2; Ex. 17, Plaintiff Decl., ¶ 5.)

h.      On September 25, 2014, after staff at FCI Mendota learned of Plaintiff's claims, Lieutenant Masterson and SIS Lieutenant Angela Smith immediately retrieved Plaintiff from his housing unit for an interview and launched an investigation including threat assessment.  (Knoll Decl., ¶ 11, Ex. 4, Operations Lieutenant Masterson Memorandum; Compl., at pp. 7-8.)

i.      Immediately upon the conclusion of their September 25, 2014, interview, Lieutenants Masterson and Smith sent Plaintiff to the Health Services and Psychology Services for clinical assessment.  (Knoll Decl., ¶¶ 12-13; Compl., at p. 2.)

j.      After September 25, 2014, Lieutenant Masterson had no further role in the investigation because SIS handles investigations of sexual abuse.  (Knoll Decl., ¶ 12.)

k.      On September 25, 2014, the Health Services medical staff examined Plaintiff who reported no physical injuries.  (Knoll Decl., ¶ 13, Ex. 5 Plaintiff Health Services Clinical Encounter 9.25.14.)

l.      On September 25, 2014, Plaintiff met with staff psychologist, Amir Mahdavi, who confirmed that Plaintiff "did not anticipate having any difficulties with staff or other inmates on the compound and reported feeling safe on the compound."  (Knoll Decl., Ex. 6, Plaintiff Psychology Services Clinical Encounter 9.25.14.)

m.      On September 26, 2014, Mahdavi conducted a follow-up with Plaintiff in Psychology Services and reported that he "appeared psychologically stable with no acute concern at the time." (Knoll Decl., ¶ 16, Ex. 10, Plaintiff Psychology Services Clinical Encounter 9.26.14.)

n.      Mahdavi's duties as a psychologist do not include making a final decision regarding the risk assessment.  (Knoll Decl., ¶ 16, Compl., at pp. 5-6.)

o.      On September 25, 2014, Lieutenant Smith interviewed Thissell, who provided a written statement in which he denied any unusual or sexually abusive conduct.  (Knoll Decl., ¶ 14, Ex. 7, Thissell 9.25.14 Memorandum for Smith.)

p.      As a result of her initial investigation, on September 25, 2014, Lieutenant Smith determined that the allegations were unverified or not validated.  (Knoll Decl., ¶ 15, Ex. 8, Update Inmate Hisotry 9.25.14.)

q.      On October 7, 2014, Smith presented the findings of her investigation to the Warden at FCI Mendota with the conclusion that Plaintiff's claim could not be verified.  (Knoll Decl., ¶ 18, Ex. 12, Lieutenant Smith Referral to Warden on 10.7.14.)

r.      After September 14, 2014, Thissell was not assigned to Plaintiff's unit after Plaintiff's claims were investigated, found to be unverified, and reported to OIG on or about October 7, 2014. (Knoll Decl., ¶ 17, Ex. 11, Thissell Housing Unit Assignment 9.1.14-12.31.14.)

s.      On October 13, 2014, Plaintiff sent another email to OIG, which was not provided to staff at FCI Mendota.  (Knoll Decl., ¶ 19, Ex. 13.)

t.      On February 9, 2015, OIA referred the matter to FCI Mendota to formalize the investigation.  Because Smith had left FCI Mendota, the matter was assigned to her replacement, Steven Knoll.  (Knoll Decl., ¶ 21, Ex. 15, 2.9.15 OIA Referral to FCI Mendota for Formal Investigation.)

u.       Upon receiving the assignment to formalize the investigation of Plaintiff's claims, Knoll re-interviewed witnesses and obtained the declarations.  (Knoll Decl., ¶ 21, Ex. 16, Knoll Memoranda for Interview & Affidavits for Formal Investigation.)

v.      On March 10, 2015, Knoll issued an OIA Investigative Report concluding that "there is not sufficient evidence to support the allegation" and finding the allegations are "not sustained." (Knoll Decl., ¶ 22, Ex. 17, Knoll Investigative Report, OIA 2015-00271.)

w.      On August 15, 2015, BOP transferred Plaintiff to FCI Terminal Island.  (Knoll Decl., ¶ 23, Ex. 1, Plaintiff's Assignment History Report at 4; Compl., at p. 10.)

2.      Defendant Thissell

Defendant Thissell has moved for summary judgment on the grounds that his conduct did not violate the Fourth or Eighth Amendments as a matter of law and that he is entitled to qualified immunity.

a.      **Fourth and Eighth Amendment Claim**

The Fourth Amendment prohibits only unreasonable searches.  Bell v. Wolfish, 441 U.S. 520, 558 (1979); Byrd v. Maricopa Cnty. Sheriff's Dep't, 629 F.3d 1135, 1140 (9th Cir. 2011); Michenfelder v. Sumner, 860 F.2d 328, 332 (9th Cir. 1988).  The Ninth Circuit has recognized that the Fourth Amendment applies to the invasion of bodily privacy in prisons.  Bull v. City & Cnty. of San Francisco, 595 F.3d 964, 974-75 (9th Cir. 2010).  The reasonableness of the search is determined by the context, which requires a balancing of the need for the particular search against the invasion of personal rights the search entails.  Bell, 441 U.S. at 558-59 (quotations omitted); Byrd, 629 F.3d at 1141; Bull v. City and Cnty. of San Francisco, 595 F.3d 964, 974-75 (9th Cir. 2010); Nunez v. Duncan, 591 F.3d 1217, 1227 (9th Cir. 2010); Michenfelder, 860 F.2d at 332-34.  Factors that must be evaluated are the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.  Bell, 441 U.S. at 559 (quotations omitted); Byrd, 629 F.3d at 1141; Bull, 595 F.3d at 972; Nunez, 591 F.3d at 1227; Michenfelder, 860 F.2d at 332.

A sexual assault on an inmate by a prison employee is deeply offensive to human dignity and violates the Eighth Amendment.  Schwenick v. Hartford, 204 F.3d 1187, 1197 (9th Cir. 2000).  The Eighth Amendment's prohibition against cruel and unusual punishment protects prisoners not only from inhumane methods of punishment but also from inhumane conditions of confinement.  Morgan v. Morgensen, 465 F.3d 1041, 1045 (9th Cir. 2006) (citing Farmer v. Brennan, 511 U.S. 825, 847 (1994) and Rhodes v. Chapman, 452 U.S. 337, 347 (1981)) (quotation marks omitted).  While conditions of confinement may be, and often are, restrictive and harsh, they must not involve the wanton and unnecessary infliction of pain.  Morgan, 465 F.3d at 1045 (citing Rhodes, 452 U.S. at 347) (quotation marks omitted).  Thus, conditions which are devoid of legitimate penological purpose or contrary to evolving standards of decency that mark the progress of a maturing society violate the Eighth

13

Amendment.  Morgan, 465 F.3d at 1045 (quotation marks and citations omitted); Hope v. Pelzer, 536

U.S. 730, 737 (2002); Rhodes, 452 U.S. at 346.

Prison officials have a duty to ensure that prisoners are provided adequate shelter, food,

clothing, sanitation, medical care, and personal safety, Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir.

2000) (quotation marks and citations omitted), but not every injury that a prisoner sustains while in

prison represents a constitutional violation, Morgan, 465 F.3d at 1045 (quotation marks omitted).  To

maintain an Eighth Amendment claim, a prisoner must show that prison officials were deliberately

indifferent to a substantial risk of harm to his health or safety.  Farmer, 511 U.S. at 847; Thomas v.

Ponder, 611 F.3d 1144, 1150-51 (9th Cir. 2010); Foster v. Runnels, 554 F.3d 807, 812-14 (9th Cir.

2009); Morgan, 465 F.3d at 1045; Johnson, 217 F.3d at 731; Frost v. Agnos, 152 F.3d 1124, 1128 (9th

Cir. 1998).

"Although the Ninth Circuit has recognized that sexual harassment may constitute a cognizable

claim for an Eighth Amendment violation, the Court has specifically differentiated between sexual

harassment that involves verbal abuse and that which involves allegations of physical assault, finding

[only] the later to be in violation of the constitution."  Minifield v. Butikofer, 298 F.Supp.2d 900, 904

(N.D. Cal. 2004) (citing Schwenk v. Hartford, 204 F.3d at 1198.)  If the sexual harassment claim is

based on brief inappropriate touching by a correctional official it is generally found to be

noncognizable, especially if the alleged touching took place pursuant to an authorized search.  "Even

if plaintiff believed that there was a sexual aspect to the search, more is needed."  Smith v. Los

Angeles County, No. CV 07-7028-VAP (MAN), 2010 WL 2569232, *5 (C.D. Cal. 2010); adopted in

full 2010 WL 2572570 (C.D. Cal. 2010); aff'd 452 Fed. Appx. 768 (9th Cir. 2011).  Thus, to support a

cognizable Eighth Amendment claim based on a body search, the plaintiff must allege a risk of harm

beyond a "momentary discomfort."  Jordan v. Garnder, 986 F.2d 1521, 1526 (9th Cir. 1993); see also

Wood v. Beauclair, 692 F.3d 1041 (in evaluating a prisoner's claim, courts will consider whether the

alleged wrongdoing was objectively "harmful enough" to establish a constitutional violation); Somers

v. Thurman, 109 F.3d 614, 624 (9th Cir. 1997) (as amended).

Defendant frames Plaintiff's claim as involving a single pat-down search on September 14,

2014; however, the allegations presented in the operative complaint involve more than a single

inappropriate pat-down search.  However, Plaintiff raises the following instances in which he was

subjected to which he claims to be unreasonable searches by Defendant Thissell: (1) pat-down search

on September 14, 2014; (2) pat-down search on October 12, 2014, which Plaintiff categorizes the

search as a rub-down, while Thissell made comments that Plaintiff had a nice body and his skin was

soft); (3) on or about October 19 through October 25, 2014, Plaintiff was subjected to a pat-down

search by Thissell, every day in which Thissell worked in his housing unit.  He told Plaintiff "you're

looking good, and ran his hands in a creep masochistic manner while making sexual comments to

Plaintiff.  On one occasion, Thissell whispered in Plaintiff's ear while rubbing Plaintiff's shoulders

and stated, "you're losing weight and you look good, Mr. Kirkelie!"  In addition, while performing a

pat-down search of Plaintiff, Thissell would often move both hands up and down each leg pushing to

Plaintiff's genitals and commented "you're not happy to see, Mr. Kirkelie?"; (4) on October 25, 2014,

Thissell singled out Plaintiff for a pat-down search, and made sexual comments to Plaintiff while he

roamed his hands over Plaintiffs chest, cupping and kneading Plaintiff's body; (5) on November 10

and 14, 2014, Thissell again singled out Plaintiff for a pat-down search, and during the search,

Thissell's hands roamed Plaintiff's body in an inappropriate manner, and Thissell made sexual

comments about Plaintiff's body and asked why he was so tense.  Thissell's hands went up and down

each leg, pausing while pressing Plaintiff's genitals; and (6) sometime in late March or early April

2015, Thissell was back working in Plaintiff's housing unit. During all of the times that Thissell

worked in Plaintiff's housing unit, he singled out Plaintiff for a pat-down search and then shook down

his locker.  During the pat-downs, Thissell moved his hands in an unprofessional manner and made

sexual comments about Plaintiff's body.

Given the nature of Plaintiff's allegations in the operative complaint, the Court cannot find that

Defendant Thissell is entitled to summary judgment based on the argument that the pat-down search

on September 14, 2014, alone, did not constitute a Fourth and/or Eighth Amendment violation.

Plaintiff's allegations in his verified complaint set forth evidence that suggests the searches were

undertaken to harass or humiliate out of retaliation and not for any legitimate purpose, and Defendant

Thissell has not shown that there is not a genuine dispute as to whether the searches violated

Plaintiff's rights under the Fourth and Eighth Amendments.

3.     Defendants Smith, Knoll, Masterson and Mahdavi

As with Defendant Thissell, Defendants Smith, Knoll, Masterson and Mahdavi move for summary judgment on the ground that the constitutional violation against them fails as a matter of law and that they are entitled to qualified immunity.

Plaintiff's claims against Defendants Smith, Knoll, Masterson and Mahdavi are based on their failure to intervene to stop Thissell from continuing his abusive searches.  Defendants argue that summary judgment is warranted because there was no identifiable risk of serious harm and none of them as investigating officials were aware of a substantial risk of serious harm.

Supervisory personnel may not be held liable under section 1983 for the actions of subordinate employees based on *respondeat superior*, or vicarious liability.  Crowley v. Bannister, 734 F.3d 967, 977 (9th Cir. 2013); accord Lemire v. California Dep't of Corr. and Rehab., 726 F.3d 1062, 1074-75 (9th Cir. 2013); Lacey v. Maricopa County, 693 F.3d 896, 915-16 (9th Cir. 2012) (en banc).  "A supervisor may be liable only if (1) he or she is personally involved in the constitutional deprivation, or (2) there is a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." Crowley, 734 F.3d at 977 (citing Snow, 681 F.3d at 989) (internal quotation marks omitted); accord Lemire, 726 F.3d at 1074-75; Lacey, 693 F.3d at 915-16.  "Under the latter theory, supervisory liability exists even without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of a constitutional violation." Crowley, 734 F.3d at 977 (citing Hansen v. Black, 885 F.2d 642, 646 (9th Cir. 1989)) (internal quotation marks omitted).

A failure to intervene can support a constitutional violation where the bystander-officers had a realistic opportunity to intervene but failed to do so.  Lolli v. County of Orange, 351 F.3d 410, 418 (9th Cir. 2003).  The failure to intervene is a theory of liability that derives meaning from the underlying violation (here, improper searches under the Fourth and Eighth Amendments), not a separate claim." Taylor v. O'Hanneson,  2014 WL 7359185, at *13 (E.D. Cal. Dec. 24, 2014) report and recommendation adopted, No. 1:11-CV-00538-LJO, 2015 WL 778473 (E.D. Cal. Feb. 24, 2015), citing Lynch v. Barrett, No. 09-cv-00405-JLK-MEH, 2010 WL 3938359, at *4-5 (D. Colo. June 9, 2010); see also Harper v. Albert, 400 F.3d 1052, 1064 (7th Cir. 2005) ("In order for there to be a

16

failure to intervene, it logically follows that there must exist an underlying constitutional violation …").

The evidence submitted by Defendants reveals that on September 25, 2014, after staff at FCI Mendota learned of Plaintiff's claims, Lieutenant Masterson and SIS Lieutenant Angela Smith immediately retrieved Plaintiff from his housing unit for an interview and launched an investigation including threat assessment.  (Knoll Decl., ¶ 11, Ex. 4, Operations Lieutenant Masterson Memorandum; Compl., at pp. 7-8.)  Immediately upon the conclusion of their September 25, 2014, interview, Lieutenants Masterson and Smith sent Plaintiff to the Health Services and Psychology Services for clinical assessment.  (Knoll Decl., ¶¶ 12-13; Compl., at p. 2.)  After September 25, 2014, Lieutenant Masterson had no further role in the investigation because SIS handles investigations of sexual abuse.  (Knoll Decl., ¶ 12)  On September 25, 2014, the Health Services medical staff examined Plaintiff who reported no physical injuries.  (Knoll Decl., ¶ 13, Ex. 5 Plaintiff Health Services Clinical Encounter 9.25.14.)

On September 25, 2014, Plaintiff met with staff psychologist, Amir Mahdavi, who confirmed that Plaintiff "did not anticipate having any difficulties with staff or other inmates on the compound and reported feeling safe on the compound."  (Knoll Decl., Ex. 6, Plaintiff Psychology Services Clinical Encounter 9.25.14.)  On September 26, 2014, Mahdavi conducted a follow-up with Plaintiff in Psychology Services and reported that he "appeared psychologically stable with no acute concern at the time."  (Knoll Decl., ¶ 16, Ex. 10, Plaintiff Psychology Services Clinical Encounter 9.26.14.)  Mahdavi's duties as a psychologist do not include making a final decision regarding the risk assessment.  (Knoll Decl., ¶ 16, Compl., at pp. 5-6.)  On September 25, 2014, Lieutenant Smith interviewed Thissell, who provided a written statement in which he denied any unusual or sexually abusive conduct.  (Knoll Decl., ¶ 14, Ex. 7, Thissell 9.25.14 Memorandum for Smith.)  As a result of her initial investigation, on September 25, 2014, Lieutenant Smith determined that the allegations were unverified or not validated.  (Knoll Decl., ¶ 15, Ex. 8, Update Inmate History 9.25.14.)  On October 7, 2014, Smith presented the findings of her investigation to the Warden at FCI Mendota with the conclusion that Plaintiff's claim could not be verified.  (Knoll Decl., ¶ 18, Ex. 12, Lieutenant Smith Referral to Warden on 10.7.14.)

17

First, as argued by Defendants, Plaintiff's claim based solely on the search on September 14, 2014, is insufficient to give rise to a claim under the Fourth and Eighth Amendments.  It is that incident, combined with the subsequent incidents of alleged abuse that give rise to claim under the Fourth and Eighth Amendments.  Therefore, the Court must review the evidence to determine when and what each individual Defendant learned of the improper searches and whether such individual was in a position to prevent them from occurring.

### a.      Defendant Masterson

As stated above, the evidence presented demonstrates that immediately after Plaintiff reported the incident on September 14, 2014, Defendants Smith and Masterson sent Plaintiff to the Health Services and Psychology Services for clinic assessment, pursuant to PREA protocols.  Because SIS handles investigations of sexual abuse, Defendant Lieutenant Masterson had no further role in the investigation, and Plaintiff fails to present any evidence to the contrary.

Based on the evidence presented, Defendant Masterson has met his burden in demonstrating that no genuine issue of material fact exists as to whether he knew of and disregarded an excessive risk to Plaintiff's health and safety and failed to intervene to prevent/stop such conduct.  Plaintiff fails to present any evidence that Defendant Masterson had any potential involvement or knowledge of Defendant Thissell's alleged misconduct after the initial September 14, 2014, incident, and absent such evidence, Plaintiff has failed to overcome the evidence presented by Defendant.  Accordingly, Defendant Masterson is entitled to summary judgment on Plaintiff's failure to intervene claim.

### b.      Defendant Mahdavi

On September 25, 2014, Defendant Mahdavi met with Plaintiff, who confirmed that Plaintiff "did not anticipate having any difficulties with staff or other inmates on the compound and reported feeling safe on the compound." (Ex. 6, Plaintiff Psychology Services Clinical Encounter 9.25.14.) Madhavi advised Plaintiff to report back to Psychology Services the next day for another consultation. (Id.)  On September 26, 2014, Mahdavi meet with Plaintiff for follow-up and reported that Plaintiff "appeared psychologically stable with no acute concern at the time."  No additional appointments were planned, but Plaintiff was advised to consult Psychological Services if the need arises. Defendant Knoll submits that Mahdavi, as a staff psychologist, does not have final decision making

authority regarding protective custody, and he has no authority over decisions regarding staff assignments.  (Knoll Decl. ¶ 16.)  Defendant Knoll declares that Mahdavi's "role in PREA investigations is to consult with inmates regarding psychological injuries and claims and make recommendations to investigators.  BOP records confirm that Mahdavi had no further involvement in the investigation."  (Id.)

In contrast, Plaintiff alleges, by way of verified complaint, that he meet with Mahdavi on four separate occasions between September 26, 2014 and October 6, 2014.  (Compl. at p. 9; ECF No. 17.)  During the first session, Plaintiff contends that Mahdavi told Plaintiff to write down the "pros" and "cons" of reports the sexual assault by Thissell.  (Id.)  On the fourth session, Plaintiff inquired as to what was being done about Thissell's sexual assault against him, and Plaintiff expressed concern that Thissell was working in his housing unit.  Plaintiff contends he "explained how the verbal sexual harassment and his being singled out for pat-down searches were becoming every day events by Thissell.  … Plaintiff explained that he felt Thissell was retaliating against him, and further felt very uncomfortable with Thissell assigned to his housing unit.  [Madhavi] concluded the session by telling the Plaintiff that there was nothing he could do to help him.  The Plaintiff's only option was to go through the administrative remedy process."  (Id. at pp. 10-11.)

Then, according to Plaintiff's allegations in his verified complaint, on October 16, 2014,[5] Plaintiff went to see Madhavi regarding Thissell working in his housing unit.  "Plaintiff explained that he was intimidated by Thissell, and there were sexual remarks being made to him, making the Plaintiff feel very uncomfortable.  The Plaintiff pleaded that [Madhavi] do something to help him.  [Madhavi] told the Plaintiff that he could not help him, and to go through the administrative remedy process."  (Id. at p. 12.)  As explained above, Plaintiff was thereafter subjected to repeated sexual assault by Defendant Thissell.

Based on Plaintiff's allegations, there is some evidence that Madhavi had knowledge of Thissell's continued presence in Plaintiff's housing unit and potential to commit further sexual assaults on Plaintiff.  Defendant Knoll acknowledges that Madhavi could have walked Plaintiff to the

---

[5] In the complaint, Plaintiff references the year as 2015, but it appears to be a typographical error as all the corresponding dates and allegations relate to the year 2014.

unit for protective housing, but argues that Madhavi as a staff psychologist does not have final

decision making authority regarding protective custody, and Plaintiff could have requested protective

custody at any time.  (Knoll Decl. ¶ 16.) The fact that Plaintiff may have requested protective custody

at any time (assuming Plaintiff had such knowledge) does not overcome the Defendants' obligation to

ensure Plaintiff's safety.  50Accordingly, summary judgment should be denied as to Defendant

Mahdavi.

### c.       Defendants Smith and Knoll

Defendant Smith conducted an investigation into Plaintiff's claim of misconduct on September

14, 2014, by interviewing Thissell and Alvarez, who both denied any misconduct.  Smith also verified

that the pat search was not video recorded, and determined if it could have been on video surveillance.

(Knoll Decl. ¶ 14.)  Based on her initial investigation, Defendant Smith determined that Plaintiff's

allegations were unverified or not validated.  (Ex. 8, Update Inmate History 9.25.14.)  Smith related

the findings to AW Lake, who informed the Warden on September 25, 2014, that the facility was

conducting an investigation.  (Ex. 9, AW Lake 9.25.14 Email to Warden.)  In conducting the

investigation, Smith used ONESOURCE, a checklist prepared to assist staff in responding to inmate's

claims of sexual abuse.  (Knoll Decl. ¶ 15.)  On October 7, 2014, Smith presented the findings to FCI

Mendota Warden and concluded that Plaintiff's claims could not be verified.  (Ex. 12, Lt. Smith

Referral to Warden on 10.7.14.)  The Warden notified OIG of the findings on October 10, 2014.

Defendant Knoll declares that Smith handled the investigation until on or about January 11, 2015

when she transferred to FCI Cumberland, Maryland.  (Knoll Decl. ¶ 3.)

Defendant Knoll declares that he took over the investigation on February 9, 2015, after Smith

left FCI Mendota, and reviewed Plaintiff's complaints against Defendant Thissell.  (Knoll Decl. ¶ 21,

Ex. 15, 2.9.15 OIA Referral to FCI Mendota for Formal Investigation.)  Knoll further declares that he

had "no material involvement in the matter" prior to February 2015.  (Knoll Decl. ¶ 3.)  Knoll

interviewed witnesses and obtained declarations.  (Knoll Decl. ¶ 21, Ex. 16, Knoll Memoranda of

Interview & Affidavits for Formal Investigation.)  Subsequently, on March 10, 2015, Knoll issued an

OIA Investigative Report concluding that "there is no sufficient evidence to support the allegation"

and finding the allegations are "not sustained."  (Knoll Decl. ¶ 23, Ex. 17, Knoll Investigative Reports, OIA 2015-00271.)

As previously stated, in his verified complaint, on or about October 12, 2014, Plaintiff returned to the housing unit, at which time he was shocked to see Thissell working in the unit.  Upon entering the unit, Plaintiff was singled out of several other inmates for a pat-down search of Plaintiff's person by Thissell.  While Thissell conducted the pat-down of Plaintiff, Thissell was laughing at Plaintiff after noticing that Plaintiff was trembling and obviously afraid of Thissell.

Thissell's hand movements were odd, as the pat-down was more along the lines of being rubbed down than a search.  Thissell made several sexual comments to the Plaintiff that he had a nice body and that his skin was soft.  Throughout Thissell's shift, he stared at Plaintiff and made inappropriate comments.

On October 15, 2014, Plaintiff while working his assigned prison job spoke to Defendant Captain (last name unknown) and the same unknown Lieutenant who was in the September 25, 2014, interview.  Plaintiff explained the sexual assault to the Captain and also stated that Thissell was continuing to make sexual remarks and single him out for pat-down searches in retaliation.  The unknown Lieutenant, in front of the Captain, told Plaintiff that he would make sure that Thissell was put in a different housing unit.

On October 16, 2014, Plaintiff went to see Mahdavi about Thissell working the housing unit. Plaintiff explained that he was intimidated by Thissell and he was uncomfortable by the sexual remarks being made to him by Thissell.  Plaintiff pleaded that Mahdavi do something to help. Mahdavi told Plaintiff that he could not help him and he had to go through the administrative remedy process.

On or about October 19 through 25, 2014, Thissell was assigned to work the Plaintiff's housing unit.  Every day that Thissell worked the Plaintiff's housing unit, he was singled out for a pat-down search and Thissell told Plaintiff "You're looking good!"  During the pat-down searches, Thissell ran his hands in a creepy masochistic manner while making sexual comments to Plaintiff.

On one occasion, Thissell whispered in Plaintiff's ear while rubbing Plaintiff's shoulders "You're losing weight and you look good, Mr. Kirkelie!"  While performing a pat-down search of

Plaintiff, Thissell would often move both hands up and down each leg pushing to the Plaintiff's genitals and commented "You're not happy to see me, Mr. Kirkelie?"

On October 25, 2014, Thissell, while working in Plaintiff's housing unit, singled out Plaintiff for a pat-down search.  Thissell made sexual comments to Plaintiff while he roamed his hands over his chest, cupping and kneading Plaintiff's body.  Thissell noticed that Plaintiff was extremely upset and proceeded to search Plaintiff's locker tossing things around while laughing at Plaintiff.
Plaintiff called his father, Jeff Kirkelie and explained the situation.  Plaintiff's father informed Plaintiff he would call the prison to address the sexual assaults by Thissell.  Plaintiff's father called Lieutenant Masterson.

On November 10 and 14, 2014, Thissell, while assigned to Plaintiff's housing unit, singled out Plaintiff for a pat-down search.  During the pat-down, Thissell's hands roamed Plaintiff's body in an inappropriate manner, and Thissell made more sexual comments about Plaintiff's body and asked why he was so tense.  Thissell's hands went up and down each leg, pausing while pressing the Plaintiff's genitals.

On November 16, 2014, Plaintiff was notified by his counselor that the initial request for an administrative remedy against Thissell was "lost."  Plaintiff then began the process all over again by submitting a new administrative remedy.

In early to mid-January 2015, Plaintiff through the prison e-mail system, contacted the Associate Warden of Operations and inquired about the status of his complaint against Thissell.  The Associate Warden informed Plaintiff that there was no record of Plaintiff's complaint.
On January 23, 2015, Plaintiff met with a prison staff member who presented him with his BP-9 (administrative remedy request) one month late.  The unknown prison official requested that Plaintiff back-date the log book in order to make the late BP-9 look as if it were in compliance and timely.  Plaintiff refused and demanded the prison official put the correct date in the log book reflecting the actual date the Plaintiff received the untimely BP-9 response from the Warden.

On March 5, 2015, Plaintiff met with A. Riofrio, who presented Plaintiff with a late BP-10 response.  A. Riofrio told Plaintiff, "it was not her fault that the BP-10 was late.  It must have been misplaced in another unit."

Plaintiff alleges that sometime in late March or early April 2015, Thissell was back working in Plaintiff's housing unit. During all of the times that Thissell worked in Plaintiff's housing unit, he singled out Plaintiff for a pat-down search and then shook down his locker. During the pat-downs, Thissell moved his hands in an unprofessional manner and made sexual comments about Plaintiff's body. On or about April 4, 2015, Plaintiff sent through the prison e-mail system to the new Warden, Zuniga, and asked why Thissell is constantly put back in the Plaintiff's housing unit with knowledge that Plaintiff had filed a sexual assault claim against him. On or about April 7, 2015, Plaintiff was summoned to see Lieutenant Knoll. Knoll told Plaintiff that their investigation was over and "Knoll will put Thissell anywhere on this compound he wants."

In the October 13, 2014, email complaint entitled "Request for Staff," Plaintiff alleged the following:

> I would like to file a further complaint on an incident that occurred on 9-14-14, and which I had already reported to this office and to the Administration here at FCI-Mendota.
>
> After filing a sexual assault complaint against C.O. Thiss[ell] and seeing the psychology department about my emotional and mental distress, that came from this incident, the Administration here thought it appropriate to assign C.O. Thiss[ell] to the unit in which I am assigned. C.O. Thiss[ell] has made comments about the incident, singled me out for a "pat down", and continues to smile and laugh at me, mocking me.
>
> I would like to file a formal complaint against the Warden and Associate Wardens for their complete disregard for my safety and emotional distress. I have been and continue to be victimized by the staff and now the administration. The Wardens continue to ignore the safety of the[ir] staff and the inmates, ignoring legitimate complaints, and failing to apply any repercussions for staff who violate the law and FBOP policies. I am also requesting a formal investigation into the continued staff misconduct and subsequent Administrative condoning of this behavior.

(Ex. 13.)

In furtherance of the investigation, Defendant Knoll interviewed Plaintiff on February 15, 2015, and Plaintiff stated, in pertinent part, the following:

> On September 25, 2014, I sent an electronic copout to PREA reporting alleging on September 7, 2014, I was inappropriately groped while being pat searched by C.O. Thissell. I had sent my original PREA concern the day it occurred, but I was not aware it was going to a private place outside of the prison, and when I got no response I wrote the one on September 25, 2014, to the Warden.

> While exiting the food service, I was called over for a pat search by Officer Thissell, and Officer Alvarez was there as well.  Thissell conducted the search, and hit my genitals with his hands when he searched my legs, and he said, "You feel different then the Mexicans."  Once the search was conducted and I started to walk away, Thissell grabbed my genitals and squeezed.  I couldn't believe what happened and I looked at Alvarez and she looked like she couldn't believe it either.  The other inmate cook, Owens (Black inmate), was present.  Owens, and whoever he was with were saying stuff like they wouldn't let this happen to them, and they were laughing.  I walked away and t[r]ied to handle this the right way.

> Since this incident, Thissell had worked my unit, A2.  While working the unit, he has acted inappropriately towards me.  I felt like he knew I had complained and he would do little stupid things.  He pat searched me very, very slowing, making sure to check my waist band in a very slow, creepy manner.  He would search me every time he worked there, making comments like I had lost weight, looked thinner, and I had no idea why he would be talking to me like this.

(Ex. 16.)

Knoll declares that Smith continued with the investigation until she left FCI Mendota in January 2015, and he (Knoll) took over the investigation around February 9, 2015.  Based on Plaintiff's allegations in his verified complaint and the investigation conducted by Defendants Smith and Knoll, there is a genuine issue of material fact as to whether Defendants Smith and Knoll knew and had an opportunity intervene in the alleged violations by Defendant Thissell, during the time of their investigations.  Plaintiff submits, and Defendants' evidence confirms, that Thissell worked in Plaintiff's housing unit subsequent to the search on September 14, 2014, and based on the evidence presented a genuine issue of triable fact exists as to Defendants' subjective awareness of a serious risk to Plaintiff's safety.[6]  As such, there is evidence from which a reasonable trier of fact could find that Defendants who were assigned to investigate Plaintiff's claims of sexual assault were aware of Thissell's actions' and if they were not, they should have been. See Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451, 456 (1992) (inferences drawn from the evidence must be viewed in the light most favorable to the non-moving party).

Indeed, this Court's determination at summary judgment, is to determine only if there is a genuine issue of material fact in dispute and the Court cannot make credibility determinations.

---

[6] Defendants submit Thissell's housing unit assignment which reflects assignment to Plaintiff's housing unit 2 on October 12-13, 2014,  October 19-22, 2014, October 25, 2014, November 10, 2014, and November 14, 2014.  (Knoll Decl. Ex. 11.) Defendants further acknowledge that Thissell worked in Plaintiff's unit on April 1, 2015.  (Knoll Decl. ¶ 17 n.3.)

1    Soremekun v. Thrifty Payless, Inc., 509 F.3d at 984; see also Thomas v. Ponder, 611 F.3d at 1150

2    (The Court determines *only* whether there is a genuine issue for trial and in doing so, it must liberally

3    construe Plaintiff's filings because he is a pro se prisoner).  Accordingly, summary judgment should

4    be denied as to Defendants Smith and Knoll.

5         4.    Qualified Immunity

6         Qualified immunity is "immunity from suit rather than a mere defense to liability; and like an

7    absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial."  Mueller v.

8    Auker, 576 F.3d 979, 993 (9th Cir. 2009) (citation and internal quotations omitted).  Qualified

9    immunity shields government officials from civil damages unless their conduct violates "clearly

10   established statutory or constitutional rights of which a reasonable person would have known."

11   Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  "Qualified immunity balances two important

12   interests – the need to hold public officials accountable when they exercise power irresponsibly and

13   the need to shield officials from harassment, distraction, and liability when they perform their duties

14   reasonably," Pearson v. Callahan, 555 U.S. 223, 231 (2009), and it protects "all but the plainly

15   incompetent or those who knowingly violate the law," Malley v. Briggs, 475 U.S. 335, 341 (1986).

16        In resolving the claim of qualified immunity, the Court must determine whether, taken in the

17   light most favorable to Plaintiff, Defendants' conduct violated a constitutional right, and if so, whether

18   the right was clearly established.  Saucier v. Katz, 533 U.S. 194, 201 (2001); Mueller, 576 F.3d at 993.

19   While often beneficial to address in that order, the Court has discretion to address the two-step inquiry

20   in the order it deems most suitable under the circumstances.  Pearson, 555 U.S. at 236 (overruling

21   holding in Saucier that the two-step inquiry must be conducted in that order, and the second step is

22   reached only if the court first finds a constitutional violation); Mueller, 576 F.3d at 993-94.

23        As explained above, Plaintiff's allegations go beyond mere verbal harassment, and viewing the

24   facts in the light most favorable to Plaintiff, as this Court must, the Court finds that a reasonable

25   officer in Defendants Thissell, Madhavi's, Knoll and Smith's position would have known that their

26   conduct violated a clearly established constitutional right to be free from sexual assault by a prison

27   official, and Defendants are not entitled to qualified immunity in this instance.

28   ///

25

**IV.**

**RECOMMENDATIONS**

Based on the foregoing, it is HEREBY RECOMMENDED that Defendants' motion for summary judgment should be granted as to Defendant Masterson only and denied as to all other Defendants.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within **thirty (30) days** after being served with these Findings and Recommendations, the parties may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  <u>Wilkerson v. Wheeler</u>, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing <u>Baxter v. Sullivan</u>, 923 F.2d 1391, 1394 (9th Cir. 1991)).


IT IS SO ORDERED.

Dated:   **February 1, 2017**

UNITED STATES MAGISTRATE JUDGE